UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-62086-CIV-COHN/SELTZER

ROLANDO CASTILLA,
an individual,

Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH
PENNSYLVANIA, a corporation,

Defendant.
_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant National Union Fire Insurance

Co. of Pittsburgh, Pennsylvania's Motion for Summary Judgment [DE 68] ("Motion").

The Court has considered the Motion, Plaintiff Rolando Castilla's Response [DE's 89,

90] ("Response") and Addendum to his Response [DE 92] ("Addendum"), Defendant's

Reply [DE 95], the record in this case, and is otherwise advised in the premises.

### I. BACKGROUND

Plaintiff Rolando Castilla brings this action to recover benefits under an

accidental dismemberment insurance policy.[1]  See Second Amendment Complaint [DE

29].  Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania

contends that Plaintiff is not entitled to benefits under the policy, and seeks damages

for insurance fraud against Plaintiff.  See Counterclaim [DE 34].

Plaintiff originally filed this action in the Circuit Court of the Seventeenth Judicial

_____

[1]     Although Plaintiff originally filed this action through counsel, he is currently
proceeding *pro se*.  See Order Granting Motion to Set Aside Clerk's Default [DE 59].

Circuit, in and for Broward County, Florida on July 5, 2011.  See Complaint [DE 4-1].

On September 22, 2011, Defendant removed the action to this Court based on diversity

jurisdiction.  See Notice of Removal [DE 1].  The pending claims are contained in

Plaintiff's Second Amended Complaint and Defendant's Counterclaim.

In the instant Motion, Defendant seeks summary judgment on Plaintiff's Second

Amended Complaint and Defendant's Counterclaim.  Plaintiff opposes summary

judgment, see Resp.; Addendum to Resp., but he has not contested Defendant's

Statement of Undisputed Facts [DE 68].  Further, the Court finds that Defendant's

Statement of Undisputed Facts is supported by the record evidence.  Therefore, under

the Local Rules, Plaintiff admits those facts.  See L.R. 56.1(b) ("All material facts set

forth in the movant's statement filed and supported as required above will be deemed

admitted unless controverted by the opposing party's statement, provided that the Court

finds that the movant's statement is supported by evidence in the record.").  The Court

recounts the pertinent facts as follows.

### A. Plaintiff's History of Eye Problems

Plaintiff's eye problems commenced no later than 2004.  That year, Plaintiff saw

Dr. Sheldon H. Feldman for cataract surgery and then laser surgery on his left eye.

See Deposition of Sheldon H. Feldman, M.D. [DE 73-8] at 9, 15-16.  Dr. Feldman also

diagnosed Plaintiff with glaucoma in his left eye and gave him eye drops for the

glaucoma.  Id. at 11, 13.  Dr. Feldman saw Plaintiff for multiple follow-up visits up

through June 2004.  Id. at 23, 26:2-4.

Then, on May 10, 2006, Plaintiff saw opthalmologist Robert Nagler, M.D.  See

Deposition of Robert Nagler, M.D. [DE 73-9] at 5:15-16.  By then, Plaintiff was no longer

using his eye drops, and he denied having glaucoma.  Id. at 12:15-13:6.  Dr. Nagler

diagnosed a detached retina and elevated intraocular pressure in Plaintiff's left eye, and

he recognized a prior cataract surgery in that eye.  Id. at 13.  Dr. Nagler arranged for

Plaintiff to see a specialist at the Retina Group, and never saw him again.  Id. at 17:11-

13.

     The next day, May 11, 2006, Plaintiff went to the Retina Group.  Deposition of

W. Scott Thompson, M.D. [DE 73-10] at 7.  Plaintiff saw Dr. Scott Anagnoste, who

wrote the following note in Plaintiff's record:

> Patient scheduled for surgery in 24 hours but patient refuses.  Wishes
> surgery on May 22nd.  Explained to patient that vision will worsen probably
> permanently.  Patient expressed understanding.  Refuses surgery on May
> 12, May 16 and May 17 of 2006.  Advised in the strongest possible terms to
> have surgery as soon as possible or risk permanent loss of vision.
> Understanding expressed.

Id. at 17.  Despite Dr. Anagnoste's recommendation, Plaintiff refused immediate

corrective surgery and instead waited until May 22, 2006, when Dr. W. Scott Thompson

performed his retinal detachment repair surgery.  Id. at 17, 21:17-21.  Plaintiff then

suffered a second retinal detachment in his left eye, and Dr. Thompson performed a

second corrective surgery on July 10, 2006.  Id. at 30:24-25.

     By September 14, 2007, Dr. Thompson measured Plaintiff's left eye's vision to

be between 20/80 and 20/60, Thompson Dep. at 38:15-24, but by March 14, 2008,

Plaintiff's left eye's vision had decreased to between 20/100 and 2/80, id. at 40:1-10.

Plaintiff complained of blurriness and pain in his left eye, and his left eye had a reduced

visual field and distortion.  Id. at 40, 41-43.  Despite instructions to follow up, Plaintiff

never returned to Dr. Thompson.  Id. at 44.

On May 1, 2008, Plaintiff returned to Dr. Feldman for the first time since June 2004.  Feldman Dep. at 23, 26:2-4.  Plaintiff complained of pain in his left eye.  Id. at 27.  Dr. Feldman measured Plaintiff's left eye's vision at 20/200, a significant deterioration since Plaintiff saw Dr. Thompson less than two months prior.  Id. at 28.  Dr. Feldman noted exotropia (a deviation of the left eye outward) and ptosis of the left eye lid.  Id. at 29.  When Dr. Feldman next saw Plaintiff, on May 19, 2008, he measured Plaintiff's left eye's vision at 20/200 once again.  Id. at 33.  Despite Dr. Feldman's instructions to follow up within three months, Plaintiff failed to do so.  Id. at 33-34.  On July 8, 2008, Dr. Feldman provided a summary of findings for Plaintiff, listing the following diagnoses: glaucoma, retinal detachment times two in the left eye, and macular degeneration in the left eye.  Id. at 43.

## B. Insurance Policy

Effective August 4, 2008, Plaintiff enrolled in an insurance policy with Defendant National Union Fire Insurance Co. of Pittsburgh, Pennsylvania.  See Certificate of Insurance, Exhibit A to Declaration of Elaine Langley [DE's 70, 76 at 4-13] ("Certificate").  Defendant had issued the policy, a Group Accident Insurance policy, to HSBC Bank, under which the bank's customers could enroll for group accident insurance coverage.  Declaration of Elaine Langley [DE's 70, 76] ¶ 2.  At the time of enrollment, each bank customer was issued a Certificate of Coverage that included the applicable terms, conditions, and exclusions pertinent to the coverage.  Id.  Plaintiff received this paperwork when he enrolled.  See Certificate.

4

## C. Publix Accident

Three months after enrolling in Defendant's group accident insurance policy, on November 9, 2008, Plaintiff was shopping at Publix when something struck him on the left side of his head and knocked him out.  Deposition of Rolando Castilla, July 14, 2010 [DE 73-6] ("Castilla Dep., July 14, 2010") at 76; Deposition of Rolando Castilla, April 16, 2012, Volume III [DE 83-1] ("Castilla Dep., April 16, 2012, Vol. III") at 302, 303-304, 306-308.  Plaintiff says he fell backwards, lost consciousness, and woke up on his back, lying face up.  Castilla Dep., April 16, 2012, Vol. III at 308-310, 305; Castilla Dep., July 14, 2010 at 76:13-18, 89:16-25.  He was transported to the hospital emergency room by ambulance.  Deposition of Rolando Castilla, January 27, 2011 [DE 73-7] ("Castilla Dep., Jan. 27, 2011") at 132:3-4.

Contrary to Plaintiff's deposition testimony that he lost consciousness in the accident, both the ambulance records and the hospital emergency records report that Plaintiff denied losing consciousness at the time of the accident.  See Ambulance Record, Exhibit A to Statement of Undisputed Facts [DE 69-1] at 3; Hospital Emergency Department Medical Record, Exhibit B to Statement of Undisputed Facts [DE 69-2] ("Hospital Record") at NW MED 4.  Further, the hospital records show that a CAT scan indicated that the head injury was "minor," there was no damage to Plaintiff's left eye, and Plaintiff was sent home.  Hospital Record at NW MED 4, 8, 9, 12.

On November 24, 2008, Plaintiff returned to Dr. Feldman.  Feldman Dep. at 35. Plaintiff had once again stopped using his prescribed eye drops for his glaucoma in his left eye, and there was high pressure in both eyes now.  Id.  At the examination that day, Plaintiff's vision in his left eye was limited only to light perception.  Id. at 36.  Dr.

5

Feldman never saw Plaintiff again after that day.  Id. at 41:9-11.  Although, at his deposition, Dr. Feldman did not have an opinion as to the ultimate cause of Plaintiff's alleged loss of vision in his left eye, he opined that Plaintiff's complaints "are contributed to by sickness, disease, or bodily infirmity."  Id. at 45.  Dr. Feldman also stated that Plaintiff "had a retinal detachment that was operated on twice, which make him more susceptible to [ ] having it detach again, which could lose his vision [sic]; and if he did not treat his glaucoma and the pressure went way up, within a year or so it's possible he could lose his vision."  Id. at 50:18-22.

Two days after visiting Dr. Feldman, Plaintiff saw Dr. Mandeep Dhalla at the Retina Group on November 26, 2008.  Thompson Dep. at 44:9-17.  Dr. Dhalla measured Plaintiff's left eye's vision at "hand motion, meaning he could only see the movement of hands, not able to count fingers or read the eye chart."  Id. at 45:6-10.  Dr. Thompson noted, however, that Dr. Dhalla's measurement relied upon Plaintiff responding truthfully to what he could see on the eye chart.  Id. at 46:12-17.

Finally, Plaintiff saw Dr. Allan Ribber, a clinical neuropsychologist several times between January and March 2009.  See Ribbler Reports [DE 69-3].  Dr. Ribbler made the following analysis:

> Measures of Test Taking Effort: The TOMM and VIP were administrated as measures of test taking effort.  His performance on the TOMM was equivocal.  He scored 38/50 on trial 1, 44/50 on trial 2 and 47/50 on trial 3.  **A score less than 45/50 on trial 2 or 3 are indicative of poor effort/malingering.**  In the normative sample, it was rare for a non-demented patient to score less than 45/50.  On the VIP only the nonverbal subtest was administered so that he was not penalized for English being his second language. His performance was interpreted as Invalid/Suppressed.  This means that his performance was "probably not an accurate representation of his maximal capacity to respond correctly."  **The pattern**

**of responses supports a conclusion that he intended to misrepresent himself as impaired**.

. . . .

Summary and Recommendations:  Rolando Castilla is a 54 year old man who reported difficulty with a variety of cognitive and physical symptoms as a result of boxes falling on his head leading to this current evaluation.  **His performance on current testing is deemed invalid and suggestive of intentional misrepresentation of his true abilities**.  No conclusions can be drawn and no recommendations can be made regarding treatment.  It is suggested that Mr. Castilla be re-evaluated if he is going to put forth his best effort on testing so that an accurate assessment can be made.

Diagnosis:

Axis I: Malingering . . .

Ribbler Neuropsychological Evaluation Report [DE 69-3 at 49-59] at 3-4, 10 (emphasis added).

## D. Plaintiff's Claims

As Defendant notes, "Despite his extensive medical history with his left eye and vision measurement of 20/200 in May 2008, [Plaintiff] has repeatedly testified that he did not have any problems with the vision in his left eye before the Publix accident on November 9, 2008."  Statement of Undisputed Facts ¶ 31 (citing Castilla Dep., Jan. 27, 2011 at 142:20-24; Castilla Dep., April 16, 2012, Vol. III at 361:21-362:10).  Further, during the claims process, Defendant asked Dr. Steward A. Levine, an ophthalmologist, to render an opinion regarding whether Plaintiff's alleged accident resulted in total and irrecoverable loss of sight in the entire left eye within 90 days of the accident, independent of sickness and disease.  Langley Decl. ¶ 4; Levine Reports, Exhibit B to Langley Decl. [DE's 70, 76 at 14-21] .  Dr. Levine responded, "the available medical records do not demonstrate that the claimant sustained any visual damage to the left

7

eye which could be attributed to the described injury.  Therefore the injury was not the

causative factor leading to the total and irrevocable loss of vision in his left eye, and the

claimant would have sustained the total and irrecoverable loss of vision in the left eye

even if the accident had not occurred."  Levine Report at NUFIC-00300-0030.

Further, on September 8, 2010, Dr. Allen J. Teman examined Plaintiff in

conjunction with a separate lawsuit that Plaintiff filed against Publix based on the same

accident at issue here.  See Teman Reports [DE 69-4].  Dr. Teman noted:

> Visual Acuity: I used a hand held eye chart.  I covered each eye and asked
> him to read the chart with the other eye.  He stated that he could not see
> anything from his left eye. I asked him to read the chart with his right eye and
> he could only read the top line (20/800).  I then asked him if he used reading
> glasses.  He then stated that he did, and pulled out a pair of glasses with
> fairly dark colored lenses.  He read the eye chart and his visual acuity of his
> right eye improved to 20/200-1 with these glasses.  I then inspected these
> tinted glasses, and they were distance lenses (negative diopter lenses).  I
> pointed out to him that the glasses that he handed to me were distance
> glasses.  He then recanted what he had just previously told me--and stated
> then stated [sic] that he did not need reading glasses to read.  I then asked
> him to read the eye chart without any glasses and the visual acuity from his
> right eye further 'improved' to 20/40-2.  *(Dr. Teman comment: The
> discordance between the different visual acuities from his right eye makes
> little sense.  If he was 20/800 with his right eye without any glasses initially,
> adding negative diopter lenses would make it more difficult for him to read--
> not better.  Then I then [sic] had him take off the distance glasses, and his
> visual acuity 'improved' to 20/40-2).*

Teman Reports, September 8, 2010 Report at 3 of 16–4 of 16.  Dr. Teman opined that

Plaintiff was not cooperating with testing, and noted that CT and MRI scans of Plaintiff's

orbits did not show findings that would account for complete loss of vision from his left

eye.  See id.  In his impressions, he noted, "Mr. Castilla's claim of complete blindness

of his left eye is untrue.  Thus his inability to drive due to the complete blindness of his

left eye, is also unsubstantiated . . . ."  Id. at 017/017.  Dr. Temen concluded, " . . . I find

8

no evidence that Mr. Castilla suffered any permanent injury from the accident that occurred on 11/9/08.  With respect to [that accident] Mr. Castilla does not warrant any further treatment.  It is my opinion that Mr. Castilla is malingering."  Id.

More recently, on December 1, 2011, Plaintiff passed the vision test required for renewal of his driver's license.  See Florida DMV Record [DE 69-5].  The DMV record showed that Plaintiff scored 20/40 for his right eye and 20/200 for his left eye, and no eye exam report from an eye doctor was required.  Id.

Finally, on March 29, 2012, private investigator Richard Mains observed and videotaped Plaintiff in his activities that day.  See Declaration of Richard Mains [DE 66-1].  Mr. Mains issued a report and submitted video footage documenting numerous inconsistencies in Plaintiff's testimony about his vision, his walking, and his driving.  See Mains Investigative Report [DE 66-2]; Surveillance Video [DE 66-3] (filed conventionally).

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To discharge this burden, the movant must show that "there is an absence of evidence to support the non-moving party's case."  Id. at 325.

After the movant has met its burden, the burden of production shifts to the non-

moving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [the Court may] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In making this determination, the Court must decide which issues are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.

### III. ANALYSIS

Defendant seeks summary judgment on Plaintiff's breach of contract claim and Defendant's insurance fraud counterclaim.  For the reasons discussed below, the Court will grant the Motion and enter summary judgment in Defendant's favor.

### A. Plaintiff's Breach of Contract Claim

In his Second Amended Complaint, Plaintiff claims that Defendant failed to pay him insurance benefits for "the total and irrecoverable loss of sight in one eye," which he allegedly suffered "within 90 days" of the date of his Publix accident.  See Sec. Am. Compl. ¶¶ 11, 14.  Therefore, he seeks past due policy benefits in the amount of

$25,000, any other benefits, interest, costs, and attorney's fees.  Id. at 3.  Defendant contends that Plaintiff does not qualify for benefits under the policy.

"Under Florida law, insurance contracts are construed according to their plain meaning."  Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005).  "[I]nsurance contracts are to be construed in a manner that is 'reasonable, practical, sensible, and just.'"  U.S. Fire Ins. Co. v. Mikes, 576 F. Supp. 2d 1303, 1315 (M.D. Fla. 2007) aff'd sub nom. U.S. Fire Ins. Co. v. Freedom Vill. of Sun City Ctr., Ltd., 279 F. App'x 879 (11th Cir. 2008) (citing Doctors Co. v. Health Mgmt. Assocs., Inc., 943 So. 2d 807, 809 (Fla. Dist. Ct. App. 2006)).  Moreover, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect."  Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000).

"[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision."  Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005) (quotation and citation omitted).  However, "[i]nsurance policy provisions excluding or limiting the insurer's liability are construed more strictly than coverage provisions."  Doctors Co.., 943 So. 2d at 809.

Reading Plaintiff's insurance policy in a reasonable, practical, sensible, and just manner, and giving each provision its full meaning and operative effect, Plaintiff cannot prevail on his breach of contract claim because he does not qualify for benefits under the plain meaning of the insurance policy's terms.  Plaintiff's Certificate of Insurance sets forth the following Accidental Dismemberment Benefit:

11

### Accidental Dismemberment Benefit

If Injury to the Insured Person results, within 90 days of the date of the accident that caused the Injury, in any one of the Losses specified below, the Company will pay the percentage shown below of the Accidental Dismemberment Benefit Maximum Amount shown in the Benefit Schedule for that Loss:

| For Loss of | Percentage of Maximum Amount |
|---|---|
| Both Hands or Both Feet | 100% |
| Sight of Both Eyes | 100% |
| One Hand and One Foot | 100% |
| One Hand and the Sight of One Eye | 100% |
| One Foot and the Sight of One Eye | 100% |
| One Hand or One Foot | 50% |
| The Sight of One Eye | 50% |

Certificate of Insurance, Exhibit A to Declaration of Elaine Langley [DE's 70, 76 at 4-13] ("Certificate") at 5.  The "'[l]oss' of sight of an eye means total and irrecoverable loss of the entire sight in that eye."  Id.  The benefits schedule indicates that the maximum benefit for accidental dismemberment in accidents not involving a common carrier or motor vehicle is $50,000.  See id. at 3.  Therefore, the total amount recoverable for the loss of sight in one eye is 50% of the $50,000 maximum, or $25,000.

The Certificate defines "injury" as follows:

**Injury** - means bodily injury: (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's coverage under the Policy is in force; (2) **which directly (independent of sickness, disease, mental incapacity, bodily infirmity or any other cause) causes a covered loss**; and (3) which occurs while such person is participating in a Covered Activity.

Id. at 4 (emphasis added).  The Certificate also includes the following exclusion:

12

**EXCLUSIONS**

No coverage shall be provided under the Policy and no payment shall be made for any loss resulting in whole or in part from, or contributed to by, or as a natural and probable consequence of any of the following excluded risks even if the proximate or precipitating cause of the loss is an accidental bodily injury.

. . . .

2.      sickness, or disease, mental incapacity or bodily infirmity whether the loss results directly or indirectly from any of these . . .

Id. at 6.[2]

Therefore, to recover $25,000 in benefits for loss of the sight of one eye, Plaintiff must establish (1) that he is blind in his left eye, (2) that blindness occurred within 90 days of the accident, and (3) that his blindness resulted neither directly nor indirectly from his prior medical history.  See Certificate at 3-5.  Plaintiff cannot establish these factors.

As explained more thoroughly in the background section above, Plaintiff has a

---

[2]      Florida law recognizes the definition of "injury" used here and the exclusion for sickness and disease.  See, e.g., The Maccabees v. Terry, 67 So. 2d 193, 196 (Fla. 1953) (approving of the general statement of law that "If an accidental injury and the preexisting disease or infirmity cooperate in causing the death of insured, double indemnity cannot be recovered, even though the injury is an active, efficient, and procuring cause, provided the disease or infirmity contributes, either directly, or indirectly, to the causing of insured's death, or if, as has been held, the disease or infirmity is the proximate cause of the insured's death . . . ."); Edwards v. Bankers Life & Cas. Co., 381 So. 2d 761 (Fla. Dist. Ct. App. 1980) (relying on a definition of "injury" and an exclusion similar to those at issue in this case, and finding no coverage where plaintiff's disability was materially attributable to prior injury); see also Westbrook v. Safeco Life Ins. Co., 908 F.2d 927, 929 (11th Cir. 1990) ("where a diseased condition aggravates the result of the injury or is, itself, aggravated thereby, there can be no recovery, where the combined result is to cause the . . . disability") (internal quotations and citations omitted); McIlraith v. Gen. Elec. Capital Assurance Co., 146 F. Supp. 2d 1304, 1305, 1307 (S.D. Fla. 2001) (finding denial of coverage proper in case where policy contained definition of "injury" similar to the definition in this case).

history of various medical problems with his left eye, dating back to 2004.  The physicians' records demonstrate that Plaintiff has glaucoma which he does not consistently treat.  <u>See</u> Feldman Dep. at 27-28, 35.  Plaintiff experienced a retinal detachment which he refused to treat within 24 hours despite his doctor's persistent recommendation, and which he ultimately required two surgeries to correct.  <u>See</u> Thompson Dep. at 17, 21, 30.  His medical records show deteriorating vision in his left eye from then on, and his vision measured at 20/200, with corrective lenses, six months before the accident occurred.  <u>See</u> Feldman Dep. at 28, 33; Thompson Dep. at 38, 40, 21-43.  Both Dr. Feldman and Dr. Thompson opined that Plaintiff's prior medical history with his left eye contributed to his current vision problems.  <u>See</u> Thompson Dep. at 52-53 ("a portion of his visual limitation could clearly be explained by a history of detachment"); Feldman Dep. at 45 ("Q: . . . do you have an opinion as to whether Mr. Castilla's complaints about his vision in his left eye are contributed to by sickness, disease, or bodily infirmity?  A: Yes.  Yeah, I think it is.").

These undisputed facts show that Plaintiff's alleged blindness in his left eye is not due solely to the Publix accident, "independent of sickness, disease, mental incapacity, bodily infirmity or any other cause."  As such, Plaintiff does not meet the Certificate's definition of "injury," and he falls under the Certificate's exclusion for "sickness, or disease, mental incapacity or bodily infirmity."  Therefore, under the plain language of the insurance policy, benefits are not due, and Plaintiff cannot prevail on his breach of contract claim.  Accordingly, the Court will enter summary judgment in Defendant's favor on Plaintiff's Second Amended Complaint.

## B. Defendant's Insurance Fraud Counterclaim

In its counterclaim, Defendant alleges that Plaintiff engaged in insurance fraud when he sought the maximum benefits in each of three insurance policies, thereby asserting that he was blind in both eyes and contending that his vision problems were solely due to the Publix accident.  See Councertcl.  Defendant contends that Plaintiff knew that these statements were false because he was never blind in both eyes, and he suffered from poor vision in his left eye before the Publix accident.  See id.  Finally, Defendant argues that Plaintiff intended for his false representations to induce Defendant to pay him insurance proceeds, and that Defendant suffered damages as a result of processing Plaintiff's claims and defending itself from Plaintiff's claims.  See id.

"[T]here are four elements of fraudulent misrepresentation: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation."  Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (quotations and citations omitted).  As explained below, Defendant meets each of these elements.

### 1. False Statements

First, Plaintiff made false statements when he sought benefits based on total blindness and permanent disability in his left eye caused by the Publix accident.  See First Am. Compl.; Certificates; Sec. Am. Compl.  In his First Amended Complaint [DE 23], Plaintiff brought claims under three certificates of insurance: Certificate No. 47722775 (" '775 Certificate") (the only policy at issue in the Second Amended

Complaint), Certificate No. 47594661 (" '661 Certificate"), and Certificate No. 47813025 (" '3025 Certificate") [DE 34-1].  He sought "at least $50,000" in damages under the '77 Certificate, First. Am. Compl. ¶ 18, but that policy only pays $50,000 for blindness in both eyes, <u>see</u> '775 Certificate.  He sought "at least $300,000" in damages based under the '661 Certificate, First. Am. Compl. ¶ 22, but such an amount would only be due for blindness in both eyes, <u>see</u> '661 Certificate.  Finally, he sought "more than $250,000" in damages under the '3025 Certificate, First Am. Compl. ¶ 25, again, an amount that would only be due for blindness in both eyes, <u>see</u> '3025 Certificate.  In his Rule 26 Disclosures [DE 68-1] and in his Amended Rule 26 Disclosures [DE 68-2], Plaintiff clarified that he sought $3,516,000 in damages, the maximum dismemberment benefit available under the '775 Certificate and the Permanent Total Disability benefit under the '661 Certificate and '3025 Certificate.  However, as described in the background section above as well as in the evidence described below, Plaintiff is not and never was totally blind in both eyes.

Then, in his Second Amended Complaint, Plaintiff sought benefits under Certificate '775 based on loss of vision in his left eye caused solely by the Publix accident.  Yet, the overwhelming evidence shows that Plaintiff suffered from poor vision in his left eye starting as early as 2004, years before the Publix accident.  Plaintiff's physicians' evaluations and reports, his own testimony, and the record evidence support the conclusion that he was untruthful with respect to his vision condition.

<u>a. Physicians' Evaluations and Reports</u>

Plaintiff's physicians' evaluations and reports show that his own statements and representations about his vision were untruthful.  For instance, Dr. Ribbler, a clinical

16

neuropsychologist, noted that Plaintiff's test results indicated "poor effort/malingering,"

and his "pattern of responses supports a conclusion that he intended to misrepresent

himself as impaired."  Ribbler Neuropsychological Evaluation Report at 3-4.  Dr. Ribbler

concluded that Plaintiff's performance was "suggestive of intentional misrepresentations

of his true abilities," and diagnosed Plaintiff with malingering.  Id. at 10.  Dr. Teman, a

neurologist who examined Plaintiff in conjunction with his lawsuit against Publix, also

found that Plaintiff was not cooperating with testing, reported that Plaintiff's CT and MRI

scans did not comport with his reported complete loss of vision in his left eye, and

noted in his impressions that "Mr. Castilla's claim of complete blindness of his left eye is

untrue."  Teman Reports, September 8, 2010 Report at 14 of 16, 16 of 16.  Dr. Teman

found the following "Hard evidence that Mr. Castilla is faking his left eye blindness":

> He does not have an obvious (4+) afferent pupillary defect of the left eye.
> Any person who has no light perception (NLP) with a reactive pupil will have
> a very marked (4+) afferent pupillary defect, but Mr. Castilla does not.  The
> lack of a marked left APD is hard evidence against an organically based
> visual loss of the left eye.

Id. at 16 of 16.  Dr. Teman went on to conclude, "Within a reasonable [degree] of

medical certainty I find no evidence that Mr. Castilla suffered any permanent injury from

the accident that occurred on 11/9/08.  With respect to [that accident] Mr. Castilla does

not warrant any further treatment.  It is my opinion that Mr. Castilla is malingering."  Id.

Further, Dr. Thompson of the Retina Group testified that "No anatomic

abnormality of the eye was detected that would explain such a dramatic worsening,"

and that his colleague was "puzzled by the marked change in vision and could not

explain it at that point."  Thompson Dep. at 51-52.  Dr. Levine, an ophthalmologist who

conducted a peer review of Plaintiff's medical records similarly opined, "Traumatic optic

neuropathy is not a viable consideration in the context of normal pupillary reflexes with no afferent pupillary defect, no visible optic atrophy, and normal optic nerve imaging on MRI." Levine Reports, March 11, 2010 at 3. Dr. Levine notes, "it is possible that the claimant chose not to read the eye chart even though he could see some of the letters on it." Id.

Moreover, Dr. Nagler, one of Plaintiff's treating ophthalmologists, explained at his deposition that a blow to the head causing brain injury would not result in blindness only to the left eye:

> Q. So, you're talking about some type of catalyst, like something that struck someone on the head, they can no longer see after that. That is one of those occurrences?
> . . .
> A. The thing is that with no light perception in both eyes it would make more sense of a brain injury as opposed to an optic nerve injury. But because of the way the brain works -- the right brain sees to the left and the left brain sees to the right --
> . . .
> A. -- if someone had damaged a part of the brain you would not expect to see no light perception in one eye and vision in the other. It would be both -- or none, usually, with a brain injury as opposed to an optic nerve injury.
> Q. But it can't happen?
> A. No, I don't believe it can.
> . . .
> Q. Okay. You mentioned that -- and please correct me if I'm wrong -- that the left brain governs vision from the right eye?
> A. No.
> Q. Or the other way around?
> A. The left brain covers vision to the right side, which deals with the left side of the retina in each eye.
> Q. In each eye?
> A. Uh-huh.
> Q. So, if someone had trauma to the left top side of the head, would that result -- could that result in blindness to just the left eye?
> . . .
> A. The type of brain injuries which will usually result in loss of vision to one side are more likely to be something such as a stroke or a tumor, not external trauma, which tends to be more widespread and less localized to

18

one side or the other, but would not involve blindness of one eye.  It would
involve defective vision to one side in each eye.

Nagler Dep. at 21-22, 28-29.  Plaintiff testified that he can see to both sides from his

right eye, Castilla Dep., April 16, 2012, Vol. III at 337:2-338:14, so he has not suffered

the type of injury that would be caused by a blow to the head.

### b. DMV Records

As additional evidence that his statements were untrue, Plaintiff's Florida DMV

records contradict his own deposition testimony.  At his deposition on November 21,

2011, Plaintiff informed Defendant's counsel that when he tried to renew his Florida

driver's license one week before the deposition, he failed his vision test, preventing him

from obtaining his renewal license.  Deposition of Rolando Castilla, November 21, 2011

[DE 73-1] ("Castilla Dep., Nov. 21, 2011") at 69:7-70:25.  When Defendant subpoenaed

Plaintiff's driver's license records from the Florida DMV, the records showed that

Plaintiff's renewal was issued ten days after the deposition, on December 1, 2011.[3]

See Florida DMV Record [DE 69-5].  In the application, Plaintiff swore under penalty of

perjury that the information he gave was true and correct.  Id. at DMV 00013.  In

response to the question, "Do you have any physical or mental disabilities that could

affect your driving?," Plaintiff answered "None."  Id.  at DMV 00015.  Yet, Plaintiff's

deposition testimony mentions numerous times that his vision is so bad he cannot

drive, or if he does drive, he does so slowly and avoids expressways.  See, e.g. Castilla

Dep., Nov. 21, 2011 at 41-42, 49-50, 52-53, 67-68.  Also, despite Plaintiff's deposition

---

[3]      There is no record from the weeks leading up to the November 21, 2011
deposition.  See Florida DMV Record.

testimony that he failed his vision test and could not obtain a renewal license, the DMV record indicates that Plaintiff passed his vision test after one single attempt, scoring 20/40 for his right eye and 20/200 for his left eye.  Florida DMV Record at DMV 00015, 00021.  No eye exam report from an eye doctor was required or anticipated to be required, and Plaintiff received his renewal license on December 1, 2011.  Id. at DMV 00013, 00015.

c. Surveillance Video

Finally, the surveillance video of Plaintiff recorded by private investigator Richard Mains on March 29, 2012 contradicts Plaintiff's testimony regarding his vision and his ability to perform certain daily tasks.  For instance, Plaintiff testified that he cannot drive, and if he has to drive, then he drives slowly and avoids expressways, see, e.g., Castilla Dep., Nov. 21, 2011 at 41-42, 49-50, 52-53, but the surveillance video shows Plaintiff driving twice on expressways between 80 and 85 miles per hour in both the middle and left lanes of heavy traffic, see Surveillance Video [DE 66-3] (filed conventionally).  Plaintiff also claimed that he could not walk at a normal pace without bumping into things, Castilla Dep., Nov. 21, 2011 at 10-11, but the surveillance video shows him walking at a normal pace without bumping into anything, see Surveillance Video.  Plaintiff further stated that he could not see anything on his left side, Castilla Dep., Nov. 21, 2011 at 24-26, 264, 267, but in the video, he appears to have no problem seeing items on his left side and avoiding bumping into anything on his left side, and he even turns to his left to back his car out, see Surveillance Video.  Finally, Plaintiff testified that he could not see a frying pan three feet in front of him, Castilla Dep., Nov. 21, 2011 at 66-67, but the video shows him leaning under the hood of a car

20

to change the battery and clean the connections at what appears to be the same distance, see Surveillance Video; see also Deposition of Rolando Castilla, April 16, 2012, Volume II [DE 73-2] ("Castilla Dep., April 16, 2012, Vol. II") at 283; Castilla Dep., April 16, 2012, Vol. III at 297-298.

In sum, the physicians' reports and evaluations and record evidence, along with Plaintiff's own testimony, show that his statements were false. He was never completely blind in both eyes when he claimed to be, and his vision problems in his left eye were not solely due to the Publix accident.

### 2. Plaintiff Knew His Representations Were False

Second, Plaintiff knew that his representations about his vision were false. Prior to filing this lawsuit, on March 6, 2009, Plaintiff filed a separate lawsuit against Publix for injuries he allegedly sustained in the same accident at issue here. In the Publix lawsuit, and before he filed this case, Plaintiff was deposed twice, on July 14, 2010 and January 27, 2011. At both depositions, Plaintiff testified about activities demonstrating that he was not blind in both eyes. See, e.g., Castilla Dep., Jan. 27, 2011 at 119-122 (explaining that he sometimes drives). The surveillance video also shows Plaintiff engaging in everyday tasks at a normal pace, activities which a blind person could not perform so easily. See Surveillance Video. Additionally, as explained above, Dr. Ribbler and Dr. Teman both opined that Plaintiff was malingering, and Dr. Thompson and Dr. Nagler's testimony shows that Plaintiff's medical records and history do not support being totally blind to the point of no light perception. See supra. The medical records also document problems that Plaintiff had with his left eye as far back as 2004, years before the Publix accident. Finally, the DMV records, along with the other record

evidence, show that Plaintiff's condition was not as he described it at his deposition or in his pleadings, and that he knew his representations were false.  See <u>supra</u>.

### 3. Plaintiff Intended For His Representations
### to Induce Defendant to Act

Third, Plaintiff intended for his statements to induce Defendant to act. Specifically, Plaintiff sought for Defendant to pay him insurance benefits based on his false representations.  <u>See</u> Compl. (seeking benefits under insurance policies); First Am. Compl. (same); Sec. Am. Compl. (same).

### 4. Defendant Was Injured as a Result
### of the Representations

Fourth, Defendant was injured as a result of the false representations because of the expense of processing Plaintiff's claims and defending itself from Plaintiff's claims. <u>See</u> Langley Dep. ¶ 5.  As of April 30, 2012, Defendant had incurred attorneys fees of $190,040.00 and costs in the amount of $10,829.57, for a total of $200,869.57 as a result of defending Plaintiff's claims in the lawsuit.  <u>Id</u>.  Since then, the amount has increased.

In sum, Defendant has shown that Plaintiff made false statements concerning material facts, he knew that his statements were false, he intended for his statements to induce Defendant to act, and Defendant was injured as a result.  Therefore, Defendant meets each element of its fraudulent misrepresentation claim, <u>see</u> <u>Butler</u>, 44 So. 3d at 105, and summary judgment will be entered on the counterclaim.

## C. Plaintiff Fails to Rebut Defendant's Evidence

In his Response and Addendum to Response, Plaintiff does not raise any disputed issues of material fact, nor does he point to any record evidence refuting Defendant's claims or contentions.  In his Addendum to Response, Plaintiff argues that he only ever sought benefits for the loss of one eye, and not both, see Addendum to Resp. at 1, and that he did suffer complete and irreversible blindness in his left eye within 90 days of the Publix accident, see Resp. at 1, but the record evidence establishes otherwise.  Additionally, Plaintiff once again attempts to bring claims under two insurance policies in addition to the one at issue in the Second Amended Complaint, id. at 1-2, but the Court has already denied Plaintiff's attempt to add two additional policies at this late stage in the litigation proceedings, see Order Denying "Motion to Include 2 Other Policies That Are Part of the Original Breach of Contract." [DE 99].  Similarly, Plaintiff accuses Defendant of "fraudulent statements with false accusations and malicious intent in order to deceive their legal obligations," Addendum to Resp. at 2; Resp. at 2-3, but, for the same reasons articulated in the Order denying Plaintiff's request to add claims under additional insurance policies, any attempt to add claims for fraud at this late stage in the litigation proceedings is improper.

Finally, although Plaintiff attaches various exhibits including letters from his previous lawyers and portions of doctors' reports, his exhibits are either inadmissible or incomplete, or do not support his arguments.  Specifically, Exhibit A to the Response [DE's 89, 90 at 9-23] consists of portions of records from Dr. George Levy, a neurologist who examined Plaintiff, but Dr. Levy has passed away, so he cannot testify at trial. Plaintiff seeks to introduce the records to prove the truth of matters asserted therein

and to show what he told Dr. Levy, but such uses which are precluded as hearsay under Federal Rules of Evidence 801 and 802.

Exhibit B [DE's 89, 90 at 24-30] consists of portions of records from Dr. William E. Smiddy, an opthalmologist retained to provide an independent medical exam in conjunction with Plaintiff's separate lawsuit against Publix. However, in Dr. Smiddy's full report [DE 95-1], he provides an opinion that supports Defendant's arguments: "there was no objective abnormality. The visual field is not characteristic of any organic neurological abnormality. I am forced to conclude that the complaints are most consistent with malingering." Id. at 2 of 2.

Exhibit C [DE's 89, 90 at 31-33] consists of two pages of a report by Dr. Allan Lane. As with Dr. Smiddy's report, Dr. Lane's report actually supports Defendant's arguments, not Plaintiff's, because Dr. Lane wrote that Plaintiff had no afferent pupillary defect, see id. at 2 of 2, and if Plaintiff actually had optic nerve damage in his left eye, then Dr. Lane should have noticed a marked afferent pupillary defect. See Teman Reports, September 8, 2010 Report at 14 of 16; Nagler Dep. at 18, 19.

Exhibit D [DE's 89, 90 at 34-36] consists of certain records from Dr. Marcia Glass, including a "Florida Department of Highway Safety and Motor Vehicles Report of Eye Exam" and one page from Dr. Glass's records. As explained in Defendant's Reply in support of its Motion to Strike Expert Witnesses [DE 94], Plaintiff never disclosed Dr. Glass as an expert witness, despite multiple opportunities to do so. Further, Plaintiff testified at his deposition that he could not remember the name of the doctor who performed his DMV vision test and that he had no records of the test, Castilla Dep. Nov. 21, 2011 at 69-71, and he failed to produce the report or Dr. Glass's name until he

24

submitted his Response to the Motion for Summary Judgment.  Disclosure of both Dr.

Glass and her records comes too late in the litigation, which is unfairly prejudicial to

Defendant.  Additionally, the Court has no way of knowing whether these records are

authentic, especially considering that they contradict the certified DMV Records that

Defendant previously filed with the Court.  Therefore, the Court declines to rely on

these records in considering this Motion for Summary Judgment.

Exhibit E [DE's 89, 90 at 37-41] is correspondence between Plaintiff and

Defendant's third-party administrator, LOTSolutions.  The document shows that

Plaintiff's claims for benefits were timely filed, but Defendant does not dispute that

issue, see Reply at 8, nor does the issue of timeliness affect Defendant's grounds for

summary judgment.

Exhibit F [DE's 89, 90 at 42-43] is a letter from Dr. Feldman stating that Plaintiff

cannot see out of his left eye and cannot drive.  However, Dr. Feldman testified that he

only wrote the note to be nice and because Plaintiff had asked for it, and that he has no

opinion regarding the cause of Plaintiff's supposed blindness.  Feldman Dep. at 45, 47-

49.

Finally, attached to Plaintiff's Addendum to Response is an exhibit [DE 92 at 5-

20] consisting of certain pre-suit demand letters and other correspondence between

Plaintiff's previous lawyers and LOTSolutions.  Nothing in these documents contradict

Defendant's Motion for Summary Judgment and accompanying exhibits.  Rather, there

is no genuine dispute as to any material fact and Defendant is entitled to a judgment as

a matter of law on Plaintiff's Second Amended Complaint and Defendant's

Counterclaim.  See  Fed. R. Civ. P. 56(a).

## IV. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** that Defendant National Union Fire Insurance Co.

of Pittsburgh, Pennsylvania's Motion for Summary Judgment [DE 68] is **GRANTED**.

The Court will enter a separate Final Judgment consistent with this ruling.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, on this 27th day of June, 2012.

_____
JAMES I. COHN
United States District Judge

Copies provided to:
Counsel of record via CM/ECF
*Pro se* party via CM/ECF regular mail